**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Douglas Harold Watts )
131 Cony Street )
Augusta, ME 04330 )
)
and )
)
Timothy Allan Watts )
663 Wareham Street )
South Middleborough, MA 02346 )
)
Plaintiffs, )
)
v. )
)
Dirk Kempthorne )
Secretary )
United States Department of the Interior )
1849 C Street, NW )
Washington, DC 20240, )
)
Carlos M. Gutierrez, )
Secretary of Commerce )
United States Department of Commerce )
1401 Constitution Avenue, NW )
Room 5516 )
Washington, DC 20230, )
)
H. Dale Hall, )
Director )
Fish and Wildlife Service )
1849 C Street, NW )
Washington, DC 20240, )
)
and )

William T. Hogarth, )
Assistant Administrator for Fisheries )
National Marines Fisheries Service )
1315 East-West Highway, Rm. 14602 )
Silver Spring, MD 20910 )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. This case, arising under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., challenges the failure of the U.S. Fish and Wildlife Service ("FWS") and the National Oceanic and Atmospheric Administration ("NOAA") National Marine Fisheries Service ("NMFS") (collectively, "Services") to make a finding as to whether the American eel warrants listing under the ESA within one year of their receipt of Petitioners' petition to list the American eel as a "threatened" or "endangered" species throughout its range. By failing to make a twelve-month finding, defendants have violated their mandatory duties under section four of the ESA, 16 U.S.C. § 1533, and defendants' own implementing regulations, 50 C.F.R. part 424, and they have acted contrary to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

### Jurisdiction

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g).

### Parties

#### A. Plaintiffs

3. Plaintiff Doug Watts has been a resident of Maine since 1984. He currently lives in Augusta, Maine, which is on the Kennebec River, one of the rivers that is home to the dwindling

population of American eels. He is a freelance writer and photographer covering outdoor activities and issues. For work and leisure, he hikes, swims, fishes, and canoes in Maine's coastal waters and riverways - on average once a week - where he derives great enjoyment from observing and studying the native flora and fauna in and around these waters, including the American eel. Although he visits other waterways, he frequents the Cobbossee Stream, Sebasticook River, Kennebec River and Androscoggin River. In so doing he has photographed the American eel and other species; observed thousands of "baby" American eels - known as glass eels - as they swim trapped at the bottom of dams, unable to make their way upstream to grow and mature; and documented the deaths of hundreds of mature American eels mutilated by hydroelectric turbines on their way downstream to spawn in the Sargasso Sea.

4. Doug Watts has been adversely affected by American eel deaths and the resulting declining populations of the American eel in a number of ways. As a freelance writer and photographer, there are fewer opportunities for him to interact with and photograph the eels, which undermines his ability to generate financial income and his ability to personally enjoy observing the species in the wild. These effects are compounded by the time he therefore spends working to protect the American eel, along with other species, rather than pursuing his profession. Moreover, his ability to enjoy trips along waterways and to observe American eels swimming in the nation's waters is undercut by his knowledge - and personal observation - of the decline of the American eel population and his gruesome discoveries of broken and mutilated American eels filling the rivers below dams.

5. As a result of these personal adverse effects, Doug Watts has become an active conservationist of Maine's indigenous fish and wildlife and their habitats, including the American

eel. One example is his service as President of Friends of the Kennebec Salmon, where he worked to protect the Atlantic Salmon. Another example of his ongoing efforts to protect Maine's flora and fauna, his ability to enjoy them, and his professional interests in writing about and photographing Maine's great outdoors and the species inhabiting them, is the petition to list the American eel under the ESA.

6. Tim Watts has been a resident of Massachusetts for decades, and he currently resides in South Middleborough, near the Weweantic River, another home of the American eel. As an adult, he is an outdoorsman who enjoys hiking, swimming, canoeing and fishing in the rivers, streams and coastal waters of New England. He frequents such places as often as four times a week. A large part of his enjoyment of such activities is the pleasure he derives from observing the species that inhabit such areas, including the American eel. For example, during his family's summer camping and canoeing trips along the Kennebec River, and his more frequent trips to the Weweantic river near his home, he specifically looks for the American eel, though he has noted a clear decline in their numbers over the years. He, too, has observed the pooling of thousands of glass eels below the dams that block their journey upstream to grow and mature. And he, too, has witnessed older American eels, chopped and broken by hydroelectric turbines which the eels often pass through in their efforts to return to the Sargasso Sea to spawn.

7. Tim Watts is personally affected by the declining populations of American eels in several ways. His enjoyment of hiking, camping and canoeing along waterways is diminished by the knowledge that the American eel, and other species, are declining, and that the very habitats he is visiting are becoming increasingly devoid of the wildlife he cares so greatly about and travels to see. When he travels to such areas, he is troubled by his own observations of the decreasing

numbers of the eel, and by his discoveries of doomed glass eels trapped below dams, and their older counterparts chopped by hydroelectric turbines. The declining population of the American eel therefore adversely affects his ability to observe the eel and to enjoy hiking, canoeing and camping in American eel habitat.

8. Doug and Tim Watts' interests - be they enjoying American eel habitat, observing the American eel in its habitat, or photographing and writing about the American eel professionally - have been injured by the defendants' failure to take steps required by the ESA to list the species under the ESA: activities that are permitted, and the manner in which activities are permitted to be undertaken, in the absence of listing are contributing to the extinction of the species, and, absent listing, defendants will not take the steps necessary to ensure the species' recovery.

**B.     Defendants**

9. Defendant H. Dale Hall is sued in his official capacity as Director of FWS ("Director"), the agency within the Department of the Interior that is responsible for implementing the ESA.

10. William T. Hogarth is sued in his official capacity as Assistant Administrator for Fisheries, National Marines Fisheries Service, NOAA, the agency within the Department of Commerce responsible for administering the ESA.

11. Defendant Dirk Kempthorne is sued in his official capacity as Secretary of the United States Department of the Interior, as he has ultimate responsibility for the implementation of the ESA by the Department of the Interior.

12. Carlos M. Gutierrez is sued in his official capacity as Secretary of the Department of Commerce, as he has ultimate responsibility for the implementation of the ESA by the Department of Commerce.

## STATUTORY FRAMEWORK AND FACTS GIVING RISE TO PLAINTIFFS' CLAIM FOR RELIEF

### A. Statutory and Regulatory Framework

13. Congress enacted the Endangered Species Act with the express purpose of providing both a "means whereby the ecosystems upon which endangered and threatened species depend may be conserved," and a "program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The principal responsibilities for implementing the ESA have been delegated by the Secretary of the Interior to FWS, and by the Department of Commerce to NMFS. Id. at § 1532(15).

14. The ESA provides for the listing of species as "threatened" or "endangered" and ascribes protections to species that are so listed. Under the ESA, a species qualifies as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range or the territorial sea of the United States," id. at § 1532(6), and "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. at § 1532(20). The Act defines species as "any subspecies of fish, wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

15. Once a species is listed as endangered it is entitled to immediate protection under the ESA. Among other things, the ESA makes it unlawful for any person to "take any . . . species within the United States" that is listed as endangered. 16 U.S.C. § 1538(a)(1)(B). The term "take" includes "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to

attempt to engage in any such conduct." Id. at § 1532(19). As permitted by 16 U.S.C. § 1533(d), these prohibitions have generally been extended to species listed as threatened under the ESA. See 50 C.F.R. § 17.31(a).

10. There are also other forms of protection accorded to species that have been listed under the ESA. For instance, Section 7 of the ESA obligates all federal agencies to consult with the Services on "any action authorized, funded, or carried out by such agency" to "insure" that the action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" which is "critical" habitat. 16 U.S.C. § 1536(a)(2). The listing of a species under the ESA also requires that the Services "develop and implement . . . recovery plans . . . for the conservation and survival of endangered species and threatened species:" plans that will bring the species back to the point at which it no longer needs the protections of the ESA. Id. at § 1533(f)(1).

11. Under the ESA, a species must be listed as endangered or threatened if the Services find that "any one or combination of the following factors" are present:

>  (A) present or threatened destruction, modification, or curtailment of [the species'] habitat or range;
> 
>  (B) overutilization for commercial, recreational, scientific, or educational purposes;
> 
>  (C) disease or predation;
> 
>  (D) the inadequacy of existing regulatory mechanisms; or
> 
>  (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1); See also 50 C.F.R. § 424.11(c). In making the determination whether to

list a particular species, the Services must make their finding "solely on the basis of the best scientific and commercial data available." Id. at § 1533(b)(1)(A); 50 C.F.R. § 424.11.

12. "To the maximum extent practicable," within 90 days of receiving a petition to list a species under the ESA the Services shall make a finding as to whether "the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. §§ 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1). If the petition presents such information, the Services must "commence a review of the status of the species concerned." 16 U.S.C. § 1533(b)(3)(A). The Services then have twelve months from the date the petition was received to conclude their review and determine whether the petitioned action is "warranted," "not warranted," or "warranted but precluded." 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3). Any interested individual may petition the Services, under the ESA, to list a species or a distinct population segment of a species as threatened or endangered under the ESA. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

13. If the Services make a "warranted" finding they "shall promptly publish" in the Federal Register a proposed regulation to list the species, and shall also solicit public input. 16 U.S.C. § 1533(b)(3)(B)(ii), 1533(b)(5); 50 C.F.R. § 424.14(b). Within one year after a proposed regulation is published, the Services generally must conclude the rule-making process by either publishing a final rule protecting the species or withdrawing the rule. 16 U.S.C. § 1533(b)(6)(A). Alternately, the agencies may make a "warranted but precluded" finding, but only if the petitioned action is precluded by other "pending proposals," "[e]xpeditious progress is being made" with regard to "qualified species," and the Services' warranted but precluded finding and rationale are published in the Federal Register. 16 U.S.C. § 1533(b)(3)(B)(iii);

50 C.F.R. § 424.14(b)(3)(iii).

15. When the Services list a species as endangered or threatened, a "final regulation designating critical habitat [for the species] shall be published concurrently with the final regulation" listing the species, unless, among other things, the Services determine that "critical habitat of such species is not then determinable." 16 U.S.C. §§ 1533(b)(6)(C), 1533(a)(3). In that event, the Services "must publish a final regulation" designating critical habitat "to the maximum extent prudent" within one year following the final listing decision. Id. "Critical habitat" is defined by the Act to include the "specific areas within the geographical area occupied by the species, at the time it is listed ... on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection," as well as those areas not occupied by the species at the time of listing that are "essential for the conservation of the species." Id. at § 1532(5)(A).

**B. Factual Background Giving Rise to Plaintiffs' Claim for Relief**

**1. The American Eel**

16. The American eel, *Anguilla rostrata*, is a long-lived migratory fish species with multiple life stages that span geographically from the Sargasso Sea, where all American eels travel to spawn, to coastal and inland waters where American eels grow and mature. Although the great majority of the American eel population is found along the Atlantic seaboard of the United States, they can also be found in the Carribean, the Gulf of Mexico, as far north as Greenland, as far south as northeastern South America, and far up the Mississippi River, its tributaries, and the Great Lakes drainages.

17. All American eels return to the Sargasso Sea, located in the Atlantic Ocean, to spawn.

Thus, to complete its unique life cycle, it is critical that American eels be able to complete their life journey from the Sargasso Sea, where they are spawned, to the variety of habitats, including coastal waters and fresh waters where they grow and mature, and back to the Sargasso Sea to themselves spawn. And it is essential that these varied habitats themselves be preserved.

**2. The Collapse Of The American Eel Population**

18. The American eel's once-abundant population has collapsed. Whereas it is estimated that the American eel once represented more than 25 percent of the total fish biomass of East Coast streams and estuaries, American eels are becoming increasingly scarce. For example, American eels in the Lake Ontario and St. Lawrence ecosystems have experienced such a drastic decline that Lake Ontario, which twenty years ago held as many as 10 million eels, is now estimated to hold only tens of thousands of eels, and the St. Lawrence River is estimated at one percent of its original stock. The massive decline of the American eel population in the Lake Ontario and St. Lawrence ecosystems is particularly alarming not only because of its severity, but because these ecosystems provide the large spawning females necessary to regenerate the American eel population throughout its range.

18. Data from fisheries similarly reflect the crashing American eel population. Commercial landings - once 3.5 million pounds - have declined significantly in the last twenty - five years. Similarly, recreational harvests have dropped from 106,968 to 10,805 eels in twenty-one years. Such significant negative trends have been corroborated in scientific studies.

19. The crashing American eel population is all the more significant when one takes into account the fact that American eels mature slowly, requiring seven to thirty or more years to reach sexual maturity, and that they spawn at the very end of their lives, meaning that all eel

mortality is pre-spawning mortality. Thus, American eel mortality is not only in and of itself harmful to the species, but it also has a significant negative impact on the ability of the species to propagate itself.

20. The impacts of the eels' decline are not limited to the American eel, but are felt throughout the ecosystem that the American eel helps support. In all life stages they serve as an important prey species for many fish, aquatic mammals, and fish-eating birds.

21. The American eel population is declining for a number of reasons. American eels have experienced severe habitat loss as a result of impassable dams on rivers and streams, as well as stream flow alteration and wetlands destruction. The impact of dams cannot be overemphasized: immature American eels - "glass eels" - are often unable to make it upstream past dams to habitats where they grow and mature, and older American eels that are ready to spawn are often unable to return to the Atlantic as they are killed by hydroelectric turbines. Studies of migrating female American eels conducted by the Maine Department of Marine Resources (MDMR) "indicate that nearly 100 percent of adult female eels entering project turbines are killed or severely injured, and therefore unable to complete their spawning migration." 70 Fed. Reg. 38,858. All told, the extent of lost habitat is staggering: 91 percent of the American eel's inland water habitat has been lost in New England; 88 percent has been lost in the Mid Atlantic region; and 77 percent has been lost in the South Atlantic region.

22. American eel populations have also been depleted by commercial overfishing. Although the commercial eel harvest was one of the largest commercial fishing activities on the east coast, the eels caught today are younger, smaller eels, which is indicative of an overfished stock. In light of the status of the American eel's population, the Province of Ontario has issued a

moratorium on harvesting the American eel, and the Atlantic States Fisheries Commission has recommended a ban on harvesting the species.

23. American eels also suffer from the lack of effective regulatory protection. It is precisely because current regulations do not adequately protect the American eel from problems such as habitat loss and over-exploitation that the species is imperilled.

24. As the above referenced issues such as impassable dams reflect, American eels are also suffering from manmade obstacles to their continued existence.

**3. The Petition To List The American Eel Under The ESA**

25. On November 12, 2004, plaintiffs filed a petition with FWS and NMFS to list the American eel as either endangered or threatened under the ESA. The Services received the petition on or about November 18, 2004. *Endangered and Threatened Wildlife and Plants; 90-Day Finding on a Petition To List the American Eel as Threatened or Endangered,* 70 Fed. Reg. 38,849 (July 6, 2005). The FWS issued a preliminary finding - a 90-day finding - on July 6, 2005 to the effect that plaintiffs' petition presented "substantial information indicating that listing the American eel may be warranted." Id. at 38,849. Among other things, the 90-day finding acknowledged that the American eel was experiencing drastic declines in essential ecosystems, id. at 38,853, due to, among other things, "commercial harvest, habitat loss and degradation due to loss of wetlands and upper tributary habitat, hydropower turbine mortality...and inadequacy of existing regulatory mechanisms." Id. at 38,860. This preliminary finding came well after the 90-day period within which the Services were required to respond to the petition. See 16 U.S.C. § 1533(b)(3)(A).

26. Despite the urgency of the American eel's condition, it has now been 19 months since

the Services received plaintiffs' petition and yet the Services still have not issued the 12-month finding that was due in November of 2005. This failure to respond in a timely fashion violates the requirement of Section 4 of the ESA to make a finding, within twelve months of receiving a petition to list a particular species, as to whether that species warrants listing under the ESA. See 16 U.S.C. § 1533(b)(3)(B).

27. On April 17, 2006, approximately 17 months after filing their original petition to list the American eel, plaintiffs sent a 60-day notice letter, pursuant to Section 11 of the ESA, 16 U.S.C. § 1540(g), indicating their intent to sue the Services for their failure to make the statutorily-required twelve-month finding with respect to the petition. The Services received the 60-day notice letter on May 1, 2006, over sixty days ago. To date, the Services have not completed the twelve-month finding on plaintiffs' petition that is required by the ESA and the Services' implementing regulations.

**PLAINTIFFS' CLAIM FOR RELIEF**

**(Violation of the ESA)**

28. Plaintiffs filed the petition at issue in this case - highlighting the collapse of the American eel for the Services - almost 19 months ago: by failing to complete a twelve-month finding as to whether the American eel warrants listing under the ESA, defendants have violated their mandatory statutory and regulatory duties under the ESA and their own implementing regulations that require them to make a finding as to whether the American eel warrants listing or not. 16 U.S.C. § 1533(b); 50 C.F.R. § 424.14. Thus, they have failed to perform non-discretionary acts or duties within the meaning of the ESA's citizen suit provision, 16 U.S.C. § 1540(g), have unlawfully withheld and unreasonably delayed agency action in violation of the

Administrative Procedure Act ("APA"), 5 U.S.C. § 555(b), and have acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

**WHEREFORE**, plaintiffs respectfully request that this Court:

1. declare that defendants have violated the Endangered Species Act;
2. declare that defendants have violated the Administrative Procedure Act;
3. order the Services to complete the twelve-month finding for the American eel petition in 60 days;
4. award plaintiffs their costs and attorneys' fees; and
5. grant plaintiffs such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Joshua R. Stebbins (D.C. Bar. No. 468542)

Howard M. Crystal (D.C. Bar No. 446189)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C. 20009
(202) 588-5206

Attorneys for Plaintiffs

Dated: July 20, 2006